FILED
CLERK
11/12/2026
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------X

MICHAEL S. WASSERMAN,

*Plaintiff*,

-against-

CITY OF LONG BEACH, NY,
DONNA M. GAYDEN, individually,
BRIAN VAIS, individually,
RONALD WALSH, individually, and
JOHN DOE POLICE OFFICERS 1-4

*Defendants*,

---------------------------------------------------------------------X

**OPINION**
**AND ORDER**

2:21-cv-2466-JMW

**APPEARANCES:**

Andrew J. Campanelli
Jean Marie Smyth
**Campanelli & Associates, P.C.**
1757 Merrick Avenue, Suite 204
Merrick, NY 11566
*Attorneys for Plaintiff*

David Henry Reinharz
Howard Marc Miller
Jacqueline Giordano
**Bond, Schoeneck, & King, PLLC**
68 South Service Road, Suite 400
Melville, NY 11747
*Attorneys for Defendants*

**WICKS**, Magistrate Judge:

Plaintiff, a resident of the City of Long Beach, alleges that the City targeted him with trumped-up charges on account of his conservative political views. The evidence, however, demonstrates that Plaintiff was not ticketed for being a Republican; he was ticketed for breaking

the law. Plaintiff's selective-enforcement and viewpoint-discrimination claims therefore fail. That said, Plaintiff is correct that the ordinance under which he was charged—a sign law that purports to prohibit some kinds of signs while allowing others, depending on topic—is unconstitutional on its face and must be stricken.

Michael S. Wasserman ("Plaintiff") brings this action under 42 U.S.C. § 1983 against the City of Long Beach (the "City") and certain of its officials (collectively, "Defendants") alleging violations of the First and Fourteenth Amendments. (*See generally* ECF No. 86 ("FAC").) Plaintiff asserts four causes of action: (1) retaliation under the First Amendment; (2) chilling of Plaintiff's exercise of his First Amendment rights; (3) selective enforcement in violation of the Fourteenth Amendment Equal Protection Clause; and (4) declaratory judgment that certain provisions of the City's "Sign Law" are unconstitutional. (*See id.* ¶¶ 75–120.) Presently before the Court are Defendants' motion for summary judgment dismissing the FAC in its entirety with prejudice (ECF No. 94) and Plaintiff's motion for partial summary judgment on his declaratory judgment claim (ECF No. 96).

## FACTUAL BACKGROUND

The following facts, drawn from the parties' Local Rule 56.1 statements and the evidence cited in them, are undisputed unless otherwise noted; where a fact is disputed, the Court sets out each side's position and supporting evidence.[1]

---

[1] Defendants' Rule 56.1 Statement is ECF No. 94-6 ("Defs.' 56.1 Stmt."); Plaintiff's is ECF No. 96-3 ("Pl.'s 56.1 Stmt."); and Defendants' response to it is ECF No. 98 ("Defs.' 56.1 Resp."). Plaintiff's response (ECF No. 100) addresses only paragraphs 6 through 25 of Defendants' statement, numbering its responses from "1"; the Court cites it ("Pl.'s 56.1 Resp.") by the number of the paragraph addressed, and cites its paragraphs 21 through 47 as "Pl.'s Counterstmt." Paragraphs 1 through 5 of Defendants' statement, to which Plaintiff did not respond, and those Plaintiff answers by stating he "has no basis to dispute or admit" them (Pl.'s 56.1 Resp. ¶¶ 14, 20–22, 25), are deemed admitted. *See* Local Rule 56.1(c); *Prudential Ins. Co. of Am. v. Payne*, No. 20-CV-3683 (JS)(JMW), 2024 WL 707299, at *1 (E.D.N.Y. Feb. 20, 2024). Many paragraphs on both sides cite only the unverified Fourth Amended Complaint,

## I. **The Parties**

Plaintiff Michael S. Wasserman owns property and resides in the City of Long Beach, whose law-enforcement agency is the Long Beach Police Department ("LBPD"). (Pl.'s 56.1 Stmt. ¶ 9; Defs.' 56.1 Stmt. ¶ 2.) At the relevant time, Defendant Donna M. Gayden was the City Manager and the City's "chief policymaking official with respect to City policy, generally including LBPD policy." (Defs.' 56.1 Stmt. ¶ 3.) Defendant Ronald Walsh became Commissioner of Police in February 2021. (ECF No. 94-5 ("Walsh Dep.") at 5:14–6:11; *see* Defs.' 56.1 Stmt. ¶¶ 4, 22.) Defendant Brian Vais is an LBPD officer, and Sergeant Walter Munsterman, a non-party, was his supervisor. (Defs.' 56.1 Stmt. ¶ 5; ECF No. 94-3 ("Vais Dep.") at 10:16–11:4.)

## II. **The Sign Law**

Chapter 3, Article I of the City's Code of Ordinances ("Chapter 3" or the "Sign Law") was enacted in 1989. (Pl.'s 56.1 Stmt. ¶ 1; ECF No. 86-10.) Section 3-7(d) provides that "[n]o sign shall be erected, affixed or maintained within the perimeter of any public mall, or upon any public street or public property." (ECF No. 86-10 at 14.) Section 3-3 exempts enumerated categories of signs, including "[t]he flags, emblems or insignia of any nation, governmental subdivision, religious or fraternal organization or corporation," from "the provisions of this chapter except as may be expressly regulated elsewhere in this article." (Pl.'s 56.1 Stmt. ¶¶ 3–7; Defs.' 56.1 Stmt. ¶¶ 6–7.) Plaintiff contends that because political flags are not exempt, Chapter 3 is content-based. (Pl.'s 56.1 Stmt. ¶¶ 2, 8.) Defendants disagree with that premise: relying on the phrase "except as may be expressly regulated elsewhere," they assert that the exemptions in

---

which is not evidence; the Court treats such a paragraph as established only where the opposing party admits it.

Section 3-3 do not reach the categorical prohibition of Section 3-7(d); hence Chapter 3 is not content-based because its prohibitions apply across the board. (Defs.' 56.1 Resp. ¶¶ 6, 8; ECF No. 94-2 ("Kalnitsky Aff.") ¶¶ 1, 13.)

## III. Plaintiff's Flags and the Complaints They Prompted

For years, Plaintiff has flown large political flags from his home and car, including the American flag, flags supporting President Donald Trump, and flags expressing—profanely—his opinion of then-President Joe Biden. (Pl.'s 56.1 Stmt. ¶¶ 10–11; Kalnitsky Aff. ¶¶ 2–3; Vais Dep. at 16:5–14.) For instance, Vais testified that at one point Plaintiff flew a "Fuck Joe Biden" flag. (Vais Dep. at 16:5–14.)

Defendant Vais, Defendant Walsh, and non-party Musterman all received calls from neighbors complaining about Plaintiff's flags. (Defs.' 56.1 Stmt. ¶¶ 20–22.) It is undisputed that Vais, Walsh and Munsterman responded to residents' complaints by defending Plaintiff's right to fly the flags, with Vais citing *Cohen v. California*, 403 U.S. 15 (1971), and Walsh emailing complainants case citations explaining that the flags were "constitutionally protected." (Defs.' 56.1 Stmt. ¶¶ 14, 20–22; Vais Dep. at 12:7–23; Walsh Dep. at 28:20–31:3.)

On or about March 16, 2021, LBPD officers came to Plaintiff's residence "as a result of complaints about one of the flags being offensive to passersby" and told him that maintaining flags on the street violated Section 3-7(d). (Pl.'s 56.1 Stmt. ¶¶ 12–13; Defs.' 56.1 Stmt. ¶ 8.) Plaintiff moved the flag critical of President Biden from his car to his home. (Pl.'s 56.1 Stmt. ¶ 14.)

## IV. The March 2021 Summons

On or before March 21, 2021, Plaintiff flew a "Trump for 2024 America First" flag, an American flag, and a "Thin Blue Line" flag from a flagpole outside his residence. (Defs.' 56.1

Stmt. ¶ 10; Pl.'s 56.1 Stmt. ¶ 15.) The pole, which Vais estimated at 25 feet, stood in a parking space, its base resting on the street beneath the front tire of Plaintiff's Porsche, which held it upright; it was not drilled into or set in the ground. (Defs.' 56.1 Stmt. ¶ 13; Pl.'s 56.1 Stmt. ¶¶ 10, 19; Vais Dep. at 13:3–14:3, 19:8–16.)






(*See* ECF Nos. 86-1, 86-2.)

On March 21, 2021, Defendant Vais arrived at Plaintiff's home and issued him a summons for violating Chapter 3, Subsection 3-7(d) of the Long Beach City Code, based on the above flags. (Defs.' 56.1 Stmt. ¶ 11; Pl.'s 56.1 Stmt. ¶ 15; ECF No. 86-9.)

The testimony traces the summons to Walsh. Asked who decided to charge Plaintiff, Walsh answered: "It was between me and Donna Gayden. I called Donna Gayden, we talked to Corporation Counsel, and we decided that would constitute a violation. So ultimately, I called the shots inside the police department . . ." (Walsh Dep. at 36:9–18; Pl.'s Counterstmt. ¶¶ 21–22.) Walsh did not recall instructing Munsterman (Walsh Dep. at 34:6–15), but Munsterman testified that Walsh called him that day and "instructed me to send a cop, and if the violation exists, issue a summons." (ECF No. 94-4 ("Munsterman Dep.") at 10:8–11:3.) Munsterman in turn told Vais, "[a]s per Commissioner Walsh, take a drive over to 75 East Broadway and if the violation of the erect flagpole is attached to the street, then issue this summons to Mr. Wasserman." (Vais Dep. at 11:15–21; Pl.'s Counterstmt. ¶ 23.) Neither officer had read the Sign Law's exemptions. (Vais Dep. at 17:16–18:10; Munsterman Dep. at 28:17–29:21.)

Vais testified that he asked Plaintiff to remove only the flag whose base was on the street, and that Plaintiff refused, declined to provide identification, argued, and went inside. (Vais Dep. at 25:8–18, 38:25–40:3; Defs.' 56.1 Stmt. ¶ 15.) Plaintiff disputes that he "affixed" any flag to the street but does not controvert that account. (Pl.'s 56.1 Resp. ¶ 15.) Vais then issued the summons charging a violation of Section 3-7(d), "Erect Signage on Public Street." (Defs.' 56.1 Stmt. ¶ 11; ECF No. 86-9.) Afterward, Plaintiff remounted the pole through his Porsche's moon-roof; because its base was no longer on the street, no further summons was issued. (Defs.' 56.1 Stmt. ¶ 16; Vais Dep. at 25:19–26:8.) None of the flags on Plaintiff's home was cited. (Defs.' 56.1 Stmt. ¶ 17.)

## V. The Basis for the Summons

The parties' central dispute is whether the summons was issued because of the flag's location or its content. Vais testified that the summons issued because the pole's base was "on the street affixed to, you know, the street," and had "[n]othing to do with the content of the signs." (Vais Dep. at 13:3–8, 40:11–15; Defs.' 56.1 Stmt. ¶¶ 12, 18.) Walsh testified that Plaintiff was cited because "[t]he flag was planted on the street within boundaries of the street." (Walsh Dep. at 12:7–16.)

Plaintiff contends that the summons was issued because his flags' content fell outside every Section 3-3 exemption, as exempt flags "could not have resulted in the issuance of a violation." (Pl.'s 56.1 Resp. ¶¶ 12, 15, 18.) When shown a photograph of one of Plaintiff's flagpoles, Walsh testified that its flags "would not be exempt according to my understanding of that code," and agreed that this was "because of the content of the flags." (Walsh Dep. at 23:12–24.) He also agreed that if the pole had held a United States flag, Plaintiff would not have been cited, explaining that "[n]one of the American flags are considered flags" under the Code. (*Id.* at 17:15–21, 23:3–10.)

## VI. Other Flags and Enforcement Practices

It is undisputed that six American flags, an Italian flag, and a POW/MIA flag were flown in public view on Park Avenue and near the boardwalk without any recorded citation, and Defendants do not dispute that "[t]he City's records for the past 22 years reflect that Plaintiff is one of only two people ever cited for violations of Chapter 3." (Pl.'s 56.1 Stmt. ¶¶ 16–18; Defs.' 56.1 Resp. ¶¶ 16–18.) Plaintiff relies chiefly on Vais's testimony that two American flags set in concrete on the public sidewalk beside a gas station are "a violation" that he had seen "many, many times" without citing. (Pl.'s Counterstmt. ¶ 26; Vais Dep. at 28:24–30:17.)




(ECF No. 86-7 (American flags affixed to the sidewalk outside a gas station).)

Defendants respond that there is no evidence that any of these flags was placed by a private citizen who, like Plaintiff, ignored a warning. (ECF No. 95 at 7.) Munsterman and Walsh believed most of the poles were erected by the City or by civic groups with its permission, though neither knew of any permit, and Walsh considered the gas-station flags "not a flag by the code." (Munsterman Dep. at 18:4–23, 22:20–23:22; Walsh Dep. at 18:11–23:6.) Walsh added that the LBPD enforced the Code reactively, ordinarily only after repeated warnings. (Walsh Dep. at 25:3–26:8.)

Defendants also point to a Pride flag that the owner of the Riptides restaurant had affixed to the boardwalk railing; Walsh testified that after Plaintiff alerted him to it, he spoke with the owner's attorney and secured its relocation, and that no summons issued because the owner cooperated. (Defs.' 56.1 Stmt. ¶ 23; Walsh Dep. at 37:2–39:11; Kalnitsky Aff. ¶ 10.) Plaintiff emphasizes Walsh's further testimony that the owner "was spoken to numerous times about flying the flag on the boardwalk" before the City "eventually got him to move" it. (Pl.'s 56.1 Resp. ¶ 18; Walsh Dep. at 37:13–20.)

**VII. <u>Subsequent Events</u>**

On Memorial Day 2021, Gayden and Walsh came to Plaintiff's home with LBPD officers and told him that flying flags from a flagpole anchored in a parking space by his car violated Chapter 3. (Pl.'s 56.1 Stmt. ¶ 19.) Plaintiff has not paid any fine, and Gregory Kalnitsky, the City's corporate counsel, avers that "no penalty of any kind was imposed." (Defs.' 56.1 Stmt. ¶ 19; Kalnitsky Aff. ¶ 9.) The record contains no document showing how the charge was resolved, however, and Walsh believed it may never have been adjudicated. (Walsh Dep. at 17:22–18:10.) Plaintiff continues to display his political flags on his property without interference. (Defs.' 56.1 Stmt. ¶ 24.)

On August 4, 2026, the City amended Section 3-3 to provide that its exemptions "shall not apply to signs or flags on public property," and replaced the exemption for national, governmental, religious, fraternal, and corporate flags with one for "[s]igns and flags on private property that comply with the other provisions of this chapter." (Kalnitsky Aff. ¶ 5, 14; Defs.' 56.1 Stmt. ¶ 25.) It took effect immediately, four weeks before the present motions were filed.

**VIII. Procedural History**

Plaintiff commenced this action on May 3, 2021. (ECF No. 1.) The operative Fourth Amended Complaint asserts § 1983 claims for First Amendment retaliation (Count I), First Amendment chilling (Count II), and selective enforcement (Count III), and seeks a declaration that the Sign Law is unconstitutional on its face and as applied (Count IV). (FAC ¶¶ 75–120.) Defendants move for summary judgment on all claims, and Plaintiff cross-moves for partial summary judgment on Count IV. (ECF Nos. 94, 96, 99, 101.) Oral argument was held on November 6, 2026. At the Court's invitation, the parties filed supplemental briefing on November 11, 2026. (ECF Nos. 104, 105.)

## LEGAL FRAMEWORK

On a summary judgment motion, the movant must demonstrate there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Novak v. City of New York*, No. 25-CV-3734 (CM), 2026 WL 265879, at *5 (S.D.N.Y. Feb. 2, 2026) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"There is no genuine issue of material fact where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (internal citation omitted). The initial burden is on the movant to demonstrate the absence of a genuine issue of material fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim. *Celotex Corp. v. Catrett*¸ 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Once the movant meets its

initial burden, the burden shifts and the nonmovant may defeat the motion only by adducing evidence of specific facts that raise a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*¸ 316 F.3d 93, 100 (2d Cir. 2002).

"The Court is to believe the evidence of the non-movant and draw all justifiable inferences in her favor, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts." *Sosa v. New York City Dep't of Educ.*, 406 F. Supp. 3d 266, 268 (E.D.N.Y. 2019) (internal citations omitted). "Where, as here, cross motions for summary judgment are filed, we evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Berg v. Vill. of Scarsdale*, No. 20-4130-CV, 2021 WL 5751385, at *1 (2d Cir. Dec. 3, 2021) (quoting *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)).

The role of the court at the summary judgment phase is not to *resolve* disputed issues of fact but only undertake an analysis to *identify* whether triable issues of fact exist. *See Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021). That is, the court's function is "issue-finding," not "issue-resolution." *Jenkins v. City of New York*, No. 21-CV-3722 (JGK), 2026 WL 2719763, at *4 (S.D.N.Y. Sept. 15, 2026) (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship* 22 F.3d 1219, 1224 (2d. Cir. 1994)). Au fond, the court's role is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant." *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (citing *Anderson*, 477 U.S. at 248 and *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir. 2013)).

## DISCUSSION

### I. Counts I and II – Retaliation and Chilling

"As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (citation modified; internal citation omitted). "To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

There is no dispute that the first element is met. Plaintiff's speech at issue consists of flags that demonstrate his "avid support of Donald Trump, and disdain for President Biden." (ECF No. 101 at 15.) As Plaintiff's flags express specific and overtly political messaging, they qualify as protected speech. *See Burns v. Martuscello*, 890 F.3d 77, 85 (2d Cir. 2018) (noting that "political speech has long stood at the 'core' of First Amendment rights"); *see also Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 777 (9th Cir. 2022) (finding that a red "Make American Great Again" hat communicates "quintessentially a matter of public concern" and constitutes protected speech). There is likewise no dispute that Defendants' action of issuing a summons was caused by Plaintiff's speech—Plaintiff's flags, after all, are the very violation for which he was ticketed. (*See* ECF No. 95 at 6; FAC ¶¶ 22, 36, 40.) Where the parties part ways is on the third element, injury.

#### A. Whether Plaintiff Was Injured

"The third element [of a First Amendment retaliation claim] is satisfied if the plaintiff shows 'either that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm.'" *Higginbotham v. City of New York*, 105 F. Supp. 3d

369, 382 (S.D.N.Y. 2015) (internal citation omitted). Normally, the plaintiff must show that the "'defendants' actions effectively chilled the exercise of his First Amendment right.'" *Searle v. Red Creek Cent. Sch. Dist.*, No. 22-2049-CV, 2023 WL 3398137, at *2 (2d Cir. May 12, 2023) (quoting *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)). "'However, in limited contexts, other forms of harm have been accepted in place of this 'actual chilling' requirement.'" *Id.* (quoting *Zherka v. Amicone*, 634 F.3d 642, 645 (2d Cir. 2011)). Such alternatives include "a 'lost government contract,' 'additional scrutiny at [a] border crossing,' 'revo[cation of] a building permit,' and a 'refusal to enforce zoning laws.'" *O'Reilly v. Inc. Vill. of Rockville Ctr.*, No. 23-CV-04249 (NCM) (JMW), 2024 WL 3328590, at *9 (E.D.N.Y. July 8, 2024) (internal citation omitted; alterations in original). Other examples include "imposition of several traffic tickets soon after protected speech, officers' pushing and deploying pepper spray after protected speech, or imposition of criminal charges after protected speech." *Schoolcraft v. City of New York*, 133 F. Supp. 3d 563, 573 (S.D.N.Y. 2015) (collecting cases). "However, they do not extend to allegations that defendants cursed at plaintiff on several occasions and acted aggressively towards him, or that defendants per se defamed defendant, or to generalized allegations of stalking." *Id.* (collecting cases).

Here, Defendants argue that Plaintiff cannot show actual chilling, as "Plaintiff remains an outspoken advocate for his political views and has gleefully invited the press to his home to view his continued display of profanity[-]laced political flags . . . and he has not hesitated to express his defiance publicly." (ECF No. 95 at 10.) In response, Plaintiff argues that his speech was actually chilled in that he had to move the flags from public property to private property. (ECF No. 101 at 7.) According to Plaintiff, "[t]he forced relocation of his flag … constitutes a concrete change in his expressive conduct." (*Id.*)

The Court need not decide whether such a *de minimis* change in behavior—moving the flag so slightly as to be imperceptible to a casual observer—constitutes actual chilling. In limiting their analysis to actual chilling, both parties misunderstand the applicable legal framework.[2] "Chilled speech is not the *sine qua non* of a First Amendment claim. A plaintiff has standing if he can show *either* that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm." *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (emphasis in original). Defendants' act of issuing a summons left Plaintiff with one of two options: either accept the violation and pay the fine, or appear in court and hire counsel to defend himself. (FAC ¶ 56.) Either way, it cost Plaintiff money. This is a concrete injury that suffices in lieu of actual chilling. *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (finding third element of a retaliation claim satisfied because "issuance of the tickets was an injury in that it subjected [the plaintiff] to a state action requiring that she either appear in court, pay a fine, or both").

In sum, Plaintiff suffered a concrete injury, which is all that is necessary to establish a prima facie claim of retaliation. As will be explained below, however, Plaintiff's retaliation claim fails for a separate reason: Defendants had probable cause to issue the summons.

**B. Probable Cause and the *Nieves* Exception**

In the context of retaliatory arrests, a plaintiff usually "must plead and prove the absence of probable cause for the arrest." *Nieves*, 587 U.S. at 402. The existence of probable cause

---

[2] Defendants' authorities are inapposite, as they predate the Second Circuit's 2013 *Dorsey* decision, which "clarified" the legal standard. *Prince v. Cnty. of Nassau*, 563 F. App'x 13, 17 (2d Cir. 2014) (noting that *Dorsey* "clarified" that a retaliation claim can succeed even without actual chilling, contrary to the implication of earlier caselaw); *see also Pluma v. City of New York*, No. 13 CIV. 2017 LAP, 2015 WL 1623828, at *7 (S.D.N.Y. Mar. 31, 2015) (rejecting defendant's contention that plaintiff must show chilling, because "the Court of Appeals recently clarified that '[c]hilled speech is not the *sine qua non* of a First Amendment claim'" (quoting *Dorsett*, 732 F.3d at 160)).

normally defeats a retaliatory arrest claim, because "'[a]n individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause,' even if that prosecution 'is in reality an unsuccessful attempt to deter or silence criticism of the government.'" *Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012) (quoting *Mozzochi v. Borden*, 959 F.2d 1174, 1180 (2d Cir. 1992)). "An officer has probable cause to arrest when the facts and circumstances known to the officer at the time of the arrest would lead a person of reasonable caution to believe that the arrestee has committed an offense." *Novak v. City of New York*, No. 25-CV-3734 (CM), 2026 WL 265879, at *7 (S.D.N.Y. Feb. 2, 2026). The probable-cause defense applies not only in the context of retaliatory arrests, but also retaliatory tickets without any arrest. *See Burden v. Inc. Vill. of Port Jefferson*, 664 F. Supp. 3d 276, 281, 283-85 (E.D.N.Y. 2023) (applying probable-cause framework to retaliatory ticket); *Richards v. City of New York*, No. 20-CV-3348 (RA)(KNF), 2021 WL 3668088, at *3 (S.D.N.Y. Aug. 18, 2021) (same).

This "no-probable-cause requirement" does not apply, however, "when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 587 U.S. at 407. "The narrow exception recognized in *Nieves* applies only where probable cause is established and would otherwise categorically bar a retaliatory-arrest claim." *Novak*, 2026 WL 265879, at *10. In such circumstances, "the exception permits a plaintiff to proceed by pointing to objective evidence of selective enforcement, such as evidence that similarly situated individuals not engaged in protected speech were not arrested." *Id.*

Defendants argue that Plaintiff's retaliation claim must fail, because the officers had probable cause to issue the ticket. (ECF No. 95 at 6.) Plaintiff does not deny that probable cause

defeats a First Amendment Retaliation claim. (*See* ECF No. 101 at 4); *Fabrikant*, 691 F.3d at 215. Plaintiff also does not appear to deny that the officers had probable cause to conclude that he violated Section 3-7(d) of the Code by maintaining a flag on public property. (*See* ECF No. 101 at 4.)[3] Instead, Plaintiff invokes the exception recognized in *Nieves*, which "account[s] for 'circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so.'" *Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024) (quoting *Nieves*, 587 U.S. at 406). According to Plaintiff, Defendants' "selective enforcement" of the Sign Law "creates a triable issue as to whether the probable cause finding was pretextual, precluding summary judgment on the retaliation claim." (ECF No. 101 at 5.)

In attempting to identify a similarly situated individual that participated in similar speech and did not receive a summons, Plaintiff points to Riptides. (*Id.* at 5-6.) The owner of Riptides Restaurant had a Gay Pride flag on display on the boardwalk, which is public property, yet did not receive a summons. (*Id.*) Rather, the police commissioner, Ronald Walsh, spoke to the owner's attorney who agreed to have the flag removed. (*Id.*) According to Plaintiff, "[t]his is precisely the type of objective, comparative evidence contemplated by *Nieves*: a private individual displaying a flag on public property who, unlike [Plaintiff], was not issued an appearance ticket after the City became aware of the violation." (*Id.* at 6.)

[3] During oral argument, Plaintiff's counsel suggested, for the first time, that Defendants lacked probable cause. The Sign Law prohibits signs "affixed or maintained" on public property. (ECF No. 86-10 at 14, § 3-7(d).) Plaintiff's flags were not installed permanently but rather were supported by Plaintiff's car. (Defs.' 56.1 Stmt. ¶ 13.) Plaintiff's counsel argued that the verb "maintained," like affixed, connotes some permanence; if so, Plaintiff did not violate the Sign Law. Defense counsel disputed that interpretation, arguing that a flag resting on the ground is "maintained" on the ground, even though it needs some outside support to hold it up. The Court declines to decide which interpretation is correct, because the Court "need not consider an argument raised for the first time at oral argument." *Standard Gen. L.P. v. Travelers Indem. Co. of Connecticut*, 261 F. Supp. 3d 502, 511 (S.D.N.Y. 2017); *see Nat'l Rifle Ass'n of Am. v. Hochul*, No. 20-3187-CV, 2021 WL 5313713, at *2 (2d Cir. Nov. 16, 2021) (declining to consider argument raised for the first time at oral argument); *see also (RC) 2 Pharma Connect, LLC v. Mission Pharmacal Co.*, No. 21-CV-11096 (LJL), 2022 WL 2441046, at *8 n.4 (S.D.N.Y. July 5, 2022) (collecting cases).

The relevant question is whether Plaintiff and the owner of Riptides were similarly situated for purposes of enforcing the ordinance. *Meyers v. City of New York*, 812 F. App'x 11, 15 (2d Cir. 2020). Defendants contend that the two situations materially differed because the Riptides owner complied with the City's requests to relocate the flag, while Plaintiff repeatedly refused to do so. (ECF No. 95 at 8.) Plaintiff rejects that distinction, asserting that the owner of Riptides "was 'spoken to numerous times' as opposed to Plaintiff, who was cited immediately after refusing to comply with Defendant Vais' first and only request." (ECF No. 101 at 6 (parentheses omitted).)

Plaintiff's narrative is not borne out by the evidence. It is true that the owner of Riptides was spoken to "numerous times" before he removed the gay pride flag. (ECF No. 94-5 at 37:15–20.) But the same is true of Plaintiff. Commissioner Walsh testified that "we operated on giving warnings and discussions to try to get people to be compliant, which we did many, many times with Mr. Wasserman." (*Id.* at 25:22–25.) He also testified that "there were so many times that I saw the flag . . . , and I would knock on [Plaintiff's] door and say you can't do that." (*Id.* at 34:18–20.) Plaintiff offers no evidence to rebut this testimony. Furthermore, it is undisputed that officers came to Plaintiff's house on March 16, 2021 to ask him to reposition his flags, but they did not issue a summons until several days later, on March 21, 2021. (*See* FAC ¶¶ 32, 44.) Officer Vais testified that when he came to Plaintiff's home on March 21, 2021, he first said, "Mike, I'm gonna have to write you a summons for this. Please just remove the flag," and only after Plaintiff refused and closed the door did Vais actually write the ticket. (ECF No. 94-3 at 39:11–40:2.) Hence, Plaintiff—like Riptides—received at least two warnings before being ticketed: once on March 16, 2021, and again on March 21, 2021.

Seeing as both Plaintiff and the Riptides owner were forewarned multiple times, Defendants' comparison stands. The owner of Riptides was warned multiple times and ultimately removed the offending sign, whereas Plaintiff was warned multiple times yet refused to remove the offending flags. This case mirrors *Meyers v. City of New York*, where "NYPD officers ordered all persons present in the Park to leave . . . or face arrest. While many protestors complied with the dispersal order, approximately 150 (including Plaintiffs) refused to leave and were subsequently arrested." *Meyers*, 812 F. App'x at 13. The Second Circuit rejected the plaintiffs' attempt to invoke the *Nieves* exception, because there was no selective enforcement—everyone who remained in the park following the dispersal order was arrested. *Id.* at 15. So too here, those who heeded police officers' warnings (*i.e.*, Riptides) were not ticketed, and those who ignored the warning (*i.e.*, Plaintiff) were ticketed.[4]

Because Plaintiff has failed to identify similarly situated individuals who violated the Sign Law but were not prosecuted, his invocation of the *Nieves* exception fails. Accordingly, Defendants' defense stands. The officers had probable cause to issue the summons, so the summons cannot constitute a retaliatory act in violation of the First Amendment. Count I of the FAC is dismissed. For the same reason, Count II, "Chilling"—which appears to be a variant of the retaliation claim—is likewise dismissed.[5]

---

[4] The Complaint identifies a few other flags that were allegedly positioned in public places without being ticketed (FAC ¶¶ 49–50), but the retaliation section in Plaintiff's opposition brief focuses on the Riptides flag. The Court discusses the other flags below. *See infra* § III.C (as-applied First Amendment claim). To the extent Plaintiff meant to rely on those instances with respect to his retaliation argument, they fail here for the same reasons addressed below, namely, the comparators were not similarly situated.

[5] Neither party addresses Count II in their briefs, but Defendants' motion seeks summary judgment dismissing the FAC "in its entirety, with prejudice." (ECF No. 94.) Where, as here, a party represented by counsel makes a partial opposition to summary judgment— "*i.e.*, referencing some claims or defenses but not others"— "a court may, when appropriate, infer from [the] partial opposition that relevant claims or defenses that are not defended have been abandoned." *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014); *see also Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts

## II. Count III – Equal Protection/Selective Enforcement

Defendants argue that Count III of the FAC, which asserts an equal-protection claim, should be dismissed because it is redundant with the First Amendment claim. (ECF No. 95 at 11.)

"The Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). The Second Circuit has "generally recognized three types of discriminatory laws: (1) a facially discriminatory law or policy that expressly classifies individuals on the basis of race; (2) a facially neutral law that is enforced in a discriminatory fashion; and (3) a facially neutral law that was adopted with discriminatory intent and resulted in a discriminatory effect." *Chinese Am. Citizens All. of Greater New York v. Adams*, 116 F.4th 161, 170 (2d Cir. 2024) (citing *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Hist. Dist. Comm'n*, 768 F.3d 183, 199 (2d Cir. 2014)).

"If an equal protection claim merely restates a First Amendment retaliation claim, however, courts in the Second Circuit have dismissed the equal-protection claim as duplicative." *McKenna v. Nassau Cnty.*, No. 223CV4286ARRST, 2023 WL 8455670, at *4 (E.D.N.Y. Dec. 6, 2023) (citation modified; internal citation omitted). "This is because 'courts should not unnecessarily stretch sections of the Constitution to reach wrongs already covered by other sections.'" *Id.* (quoting *Best Payphones, Inc. v. Dobrin*, 410 F. Supp. 3d 457, 484 (E.D.N.Y. 2019)); *see, e.g.*, *Doe v. Salina*, No. 23-CV-3529 (JMW), 2024 WL 5077629, at *29 (E.D.N.Y. Dec. 11, 2024) (dismissing Equal Protection claim as duplicative of First Amendment retaliation claim); *Dolce v. Connetquot Cent. Sch. Dist.*, No. 24-CV-00622 (HG), 2025 WL 1070079, at *11

---

may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

(E.D.N.Y. Apr. 9, 2025) (dismissing First Amendment retaliation claim and also dismissing as duplicative Equal Protection claim predicated on the same allegations), *aff'd*, No. 25-1197, 2026 WL 2560338 (2d Cir. Aug. 31, 2026).

Here, Plaintiff insists that his Equal Protection claim is not duplicative, as it is "analytically distinct from his retaliation claim." (ECF No. 101 at 9.) But that assertion is wholly conclusory. Plaintiff provides no legal analysis distinguishing the two claims. He notes that the Equal Protection claim revolves around "differential treatment" (*id.*), but, fatally, that is true of his First Amendment retaliation claim as well. The Court addressed differential treatment above, in considering whether the *Nieves* exception can salvage Plaintiff's retaliation claim despite probable cause. *See supra* § I.B. Because "both claims rely on identical facts" and the Equal Protection "simply repackage[s]" the First Amendment retaliation claim, the Court dismisses the Equal Protection claim. *Loc. 3599, NYC Dep't of Env't Prot. Tech. Pro. Emps. v. City of New York*, No. 23-CV-1035 (JGLC), 2024 WL 966077, at *12 (S.D.N.Y. Mar. 6, 2024) (dismissing Equal Protection claim where the First Amendment retaliation claim already considered whether "similarly situated co-employees were treated differently"); *see also Whitehead v. City of New York*, 953 F. Supp. 2d 367, 377 (E.D.N.Y. 2012) (dismissing First Amendment retaliation claim and dismissing Equal Protection claim as duplicative).

Even if the Equal Protection claim were not duplicative, however, it would still fail on the merits. "A plaintiff proceeding on a selective-enforcement Equal Protection theory must show that '(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.'" *Lepper v.*

*Scordino*, No. 22-1064, 2023 WL 4004220, at *1 (2d Cir. June 15, 2023) (summary order) (quoting *Hu v. City of New York*, 927 F.3d 81, 91 (2d Cir. 2019)); *see also Dolce v. Connetquot Cent. Sch. Dist.*, No. 25-1197, 2026 WL 2560338 (2d Cir. Aug. 31, 2026). "Generally, to establish differential treatment, a plaintiff must demonstrate that the defendant had knowledge of violations committed by others, but declined to enforce them." *Chinese Am. Citizens All. Greater New York v. New York City Dep't of Educ.*, 802 F. Supp. 3d 483, 527 (S.D.N.Y. 2025) (quoting *Glover v. City of New York*, No. 15 Civ. 4899 (MKB), 2018 WL 4906253, at *14 (E.D.N.Y. Oct. 9, 2018)).

In *Lepper*, for example, "the village's scrutiny of the [plaintiffs' code violation] began when the village building inspector received a complaint that the Leppers were building a treehouse without a permit." 2023 WL 4004220, at *2. "Thus, to identify a similarly situated comparator, [the plaintiff had to] show, at minimum, that the village was put on notice of another village resident who had built a treehouse without a permit." *Id.* The fact that other people in the neighborhood built unpermitted treehouses was not enough. *Id.* Rather, the question was whether the village "was put on notice" of those other violations—which the plaintiffs failed to show. *Id.* Because the village was never notified, the Second Circuit held the plaintiffs and the comparators "materially dissimilar." *Id.*; *see also LaTrieste Rest. v. Vill. of Port Chester*, 188 F.3d 65, 69 (2d Cir. 1999) (holding plaintiff failed to establish that it was "singled out for selective treatment," despite the existence of other violations, because the plaintiff "failed to show that the Village knew about" the other violations).

Here, Defendants were not aware of the Riptides flag until it was brought to their attention, and once it was brought to their attention, they promptly directed the owner to remove it. *See supra* § I.B. The same is true of the other comparators Plaintiff points to, as will be

addressed below. *See infra* § III.C. "As a general matter, courts do not fault local governments for not tracking down and pursuing the relevant comparators." *3086 Purchase LLC v. Town of Harrison*, No. 25-CV-9917 (JGLC), 2026 WL 2942870, at *20 (S.D.N.Y. Sept. 30, 2026) (dismissing Equal Protection claim where plaintiff failed to demonstrate that the town knew of the other violations); *Lamothe v. Town of Oyster Bay*, No. 08-CV-2078 ADS AKT, 2012 WL 6720781, at *9 (E.D.N.Y. Dec. 27, 2012) (same on summary judgment). Accordingly, the Court grants summary judgment in favor of Defendants on Count III of the FAC.

## III. Count IV – Declaratory Judgment that the Sign Law is Unconstitutional

### A. The Sign Law is Unconstitutional

Plaintiff contends that the City's Sign Law is unconstitutional on its face because it "regulates flags and signs based on their communicative content[.]" (ECF No. 96-4 at 1.) Specifically, Plaintiff understands that the Sign Law bans only *political* flags, while allowing a host of others such as flags of nations and other political subdivisions, religious or fraternal organizations, and corporations. (*Id.*) As a "content-based" restriction, Plaintiff contends that the law is subject to strict scrutiny and presumptively unconstitutional. (*Id.*)

Defendants respond that Plaintiff misunderstands the ordinance. (ECF No. 95 at 14.) It does not single out political speech, according to Defendants. (*Id.*) It prohibits *all* signs—political and non-political alike—but only on public property. (*Id.* at 14–17.) As a "content-neutral" regulation, the Sign Law may be constitutional. (*Id.*)[6]

[6] Defendants do not actually use the term "content-neutral" anywhere in their brief, and they appear to be agnostic or unsure about the appropriate level of scrutiny to be applied here. The case they cite, however, is about content-neutral time-place-and-manner restrictions. *Berg v. Vill. of Scarsdale*, No. 20-4130-CV, 2021 WL 5751385 (2d Cir. Dec. 3, 2021). The Court therefore assumes that that is the thrust of their position.

The debate arises out of the interplay between several provisions of the code. Section 3-1 lays out the legislative intent, which includes protecting the physical appearance of the community, protecting property values, and reducing distractions or obstructions that could contribute to traffic accidents. (ECF No. 86-10 at 2.) Section 3-2 provides definitions. (*Id.* at 2–5.)

Section 3-3, titled "Exemptions," lays out a list of signs that are "exempt from the provisions of this chapter except as may be expressly regulated elsewhere in this article." (*Id.* at 5.) The exemptions include "flags, emblems or insignia of any nation, governmental subdivision,[7] religious or fraternal organization or corporation," as well as "[r]eligious symbols, commemorative plaques of recognized historical agencies or identification emblems of religious organizations, fraternal organizations or historical agencies." (*Id.* at 5–6.)

Section 3-4 prohibits certain signs, Section 3-5 regulates "Business districts," and Section 3-6 regulates "Residential districts." (*Id.* at 6–13.)

Finally, Section 3-7 lays out "Provisions applicable to all districts." (*Id.* at 13.) Relevant here, Section 3-7(d) mandates that "[n]o sign shall be erected, fixed or maintained within the perimeter of any public mall, or upon any public street or public property." (*Id.* at 13–14.) This is the provision that Plaintiff was charged in the March 21, 2021 summons with violating. (ECF No. 86-9.)

Defendants understand that Section 3-7(d)'s categorical ban on signs on public property supersedes Section 3-3's exemptions. (ECF No. 95 at 14.) Section 3-3, after all, only purported

[7] As an aside, the Court notes that this provision of the code seems to be a non-sequitur. Under section 3-2, the word "sign" "does not include flag, pennant or insignia of any nation, state, city or other governmental unit." Section 3-3 then purports to exempt certain "signs," including "flags, emblems or insignia of any nation[ or] governmental subdivision[.]" But flags of governments and nations were already excluded from the very definition of the word "sign," so exempting such "signs" is an oxymoron, or at best superfluous.

to provide exemptions "except as may be expressly regulated elsewhere in this article." Section 3-7 is that express regulation. (*Id.*)

Defendants' reading is untenable. Section 3-7 is not an express regulation that overrides Section 3-3's exemption. Section 3-7 is the very provision that Section 3-3 exempts. An exemption implies something to be exempt from. *Cf. United States v. Morrow*, 266 U.S. 531, 534–35 (1925) (noting the general presumption that "a proviso is to except something from the enacting clause"). For Section 3-3 to be meaningful, something must have been presumptively forbidden or restricted such that Section 3-3 can then provide a carveout to that restriction. The following statement is logical: "All signs on public property are forbidden, except flags of nations or religious symbols." The latter half of the sentence (the exemption, Section 3-3) takes on meaning against the backdrop of the former (the prohibition, Section 3-7). But it is not logical to say in a vacuum that "flags of nations and religious symbols are exempt," because it begs the question, *exempt from what*? On Defendants' reading, the exemptions laid out in Section 3-3 do not exempt anything from anything, because they do not attach to the prohibitions elsewhere in the article.[8]

By way of analogy, Section 5 of the Securities Act of 1933 restricts the sale of securities before a registration statement has been filed. 15 U.S.C. § 77e. Section 3 provides that "[e]xcept as hereinafter expressly provided, the provisions of this subchapter shall not apply to" certain

---

[8] By way of contrast, the phrase "except as may be expressly regulated elsewhere in this article" does real work with respect to § 3-3(r), which exempts "[s]igns affixed to interior of business windows[.]" (ECF No. 86-10 at 6.) Per that exemption, general prohibitions laid out elsewhere in the chapter—such as § 3-7(d)'s ban on signs in public malls or streets—would not apply to signs inside a business window. However, interior window signs *in business districts* are subject to "express regulation elsewhere in the article," namely, in § 3-5. (*Id.* at 7.) Specifically, in business districts, § 3-5(f)(1) restricts "permanent" interior signs whereas § 3-5(g)(9) permits "temporary" interior signs. (*Id.* at 10–11.) This express regulation supersedes § 3-3(r)'s general exemption. Hence, interior window signs are exempt from most prohibitions even if permanent; in business districts, however, permanent interior window signs are banned.

enumerated classes of securities. 15 U.S.C. § 77c. By Defendants' logic, the categorical prohibitions in Section 5 would apply even to the securities enumerated in Section 3, because Section 3 itself acknowledges that the exemptions laid out therein can be superseded "as hereinafter expressly provided[.]" But of course the opposite is true: "The general registration requirement in the Securities Act, Section 5, provides that it is unlawful to sell or offer for sale a security unless a registration statement has been filed . . . . Sections 3 and 4 of the Securities Act create exceptions to the registration requirements." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 454 (S.D.N.Y. 2003); *see also S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 297 (1946); *Sabby Volatility Warrant Master Fund Ltd. v. Kiromic Biopharma, Inc.*, 638 F. Supp. 3d 393, 396 (S.D.N.Y. 2022).

Accordingly, Section 3-7(d) of the Sign Law prohibits signs on public property, but, pursuant to Section 3-3, a host of signs are exempt from that prohibition—including "flags, emblems or insignia of any nation, governmental subdivision, religious or fraternal organization or corporation," as well as "[r]eligious symbols, commemorative plaques of recognized historical agencies or identification emblems of religious organizations, fraternal organizations or historical agencies[.]" What remains is a ban on political signs.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* In *Reed*, the Supreme Court held that a town's sign code was content-based—and therefore subject to strict scrutiny—where it imposed different restrictions on different categories of signs: one set of

rules for signs designed to influence the outcome of an election, another for signs directing the public to church, and another for signs communicating a message or ideas. *Id.* at 164.

Applying those principles, Section 3-7(d) of the Sign Law—which bans some kinds of signs on public property but exempts others—is content based and therefore subject to strict scrutiny. *Marin v. Town of Se.*, 136 F. Supp. 3d 548, 567 (S.D.N.Y. 2015) (finding sign law content-based where it exempted some types of signs but did not exempt political signs).

Under strict scrutiny, the Sign Law must be "the least restrictive means of achieving a compelling state interest." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025) (internal citation omitted). Defendants do not put forward any argument as to why the City's interest is "compelling" or why that interest could not have been achieved through less restrictive means. (*See generally* ECF No. 95 at 13–17.) They hang their hat entirely on how to interpret the Sign Law, tacitly recognizing that under Plaintiff's interpretation—with which the Court agrees—the law would in fact be unconstitutional. Accordingly, the Court finds that Section 3-7(d) of the Sign Law is unconstitutional on its face. *See Marin*, 136 F. Supp. 3d at 569 (finding town's sign law facially unconstitutional where state need was not compelling and law was not narrowly tailored); *Clear Channel Outdoor, Inc. v. Town Bd. of Town of Windham*, 352 F. Supp. 2d 297, 309–10 (N.D.N.Y. 2005) (finding facially unconstitutional a town ordinance prohibiting flags but carving out exceptions by topic); *see also Withers v. Vill. of Airmont*, No. 07 CIV. 9674 (SCR), 2010 WL 11712641, at *3–4 (S.D.N.Y. Apr. 30, 2010) (similar).

**B. Plaintiff's Claim is Not Moot**

In the alternative, Defendants argue that Plaintiff's facial challenge is now moot, because the Town has since amended the code to clarify that the exemptions in Section 3-3 are not applicable to Section 3-7(d). (ECF No. 95 at 17.) "'The voluntary cessation of allegedly illegal conduct usually will render a case moot' if '(1) there is no reasonable expectation that the alleged

violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Doe v. McDonald*, 128 F.4th 379, 385 (2d Cir. 2025) (quoting *Lamar Advert. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 375 (2d Cir. 2004)). As such, "'[c]onstitutional challenges to statutes are routinely found moot when a statute is amended.'" *Lamar*, 356 F.3d at 375 (quoting *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 59 (2d Cir. 1992)) (alteration in original); *see, e.g.*, *B.C. v. Colton-Pierrepont Cent. Sch. Dist.*, 357 F. App'x 366, 368 (2d Cir. 2009) (dismissing as moot where a subsequent amendment to the law "obviate[d]" the plaintiffs' claim); *Orthodox Jewish Coal. of Chestnut Ridge v. Vill. of Chestnut Ridge, New York*, No. 19-CV-443 (KMK), 2021 WL 1226930, at *6 (S.D.N.Y. Mar. 31, 2021) (dismissing as moot plaintiffs' claims for declarative and injunctive relief, because the government revised the allegedly unconstitutional law after plaintiffs filed suit); *Marin*, 136 F. Supp. 3d at 563 (similar).

Here, on August 4, 2026, the Town revised Section 3-3 to make clear that the exemptions therein "shall not apply to sign or flags on public property[.]" (ECF No. 94-2.) According to Defendants, this makes explicit the reading they urged all along: the prohibition in Section 3-7(d) applies across the board, categorically prohibiting signs on public property regardless of topic. If so, Plaintiff's claim for declaratory relief (FAC ¶ 120) would be moot.

That argument fails, however, because changing Section 3-3 alone did not solve the problem. (*See* ECF Nos. 102 at 6, 104 at 4.) Under Section 3-2, "Definitions," the word "sign" "does not include flag, pennant, or insignia of any nation, state, city or other governmental unit." (ECF No. 86-10 at 4.) The prohibition in Section 3-7(d) under which Plaintiff was cited is pegged to "signs": "No *sign* shall be erected, affixed or maintained within the perimeter of any public mall, or upon any public street or public property." (*Id.* at 14 (emphasis added).) By its

plain terms, then, the prohibition does not extend to governmental flags such as an American flag or an Italian flag. This carveout makes the Sign Law content-based. *Willson v. City of Bel-Nor, Missouri*, 924 F.3d 995, 1000–01 (8th Cir. 2019) (finding ordinance content-based where it excluded flags from the definition of signs).

Furthermore, Plaintiff also seeks compensatory damages and attorneys' fees and costs. (FAC ¶ 120.) "[S]o long as the plaintiff has a cause of action for damages, a defendant's change in conduct will not moot the case." *Marin*, 136 F. Supp. 3d at 562 (quoting *Buckhannon Bd. & Care Home, Inc. v. W.Va. Dep't of Health & Human Res.*, 532 U.S. 598, 608–09 (2001)) (finding claim for damages still viable even after change in law mooted declaratory relief); *Mejia v. Cnty. of Rockland*, No. 23-CV-492 (NSR), 2025 WL 3678126, at *7 (S.D.N.Y. Dec. 17, 2025) (same).

Consequently, Plaintiff is entitled to summary judgment on the facial prong of Count IV, with respect to both declaratory relief and monetary damages.

**C. As-Applied**

Plaintiff alleges that the Sign Law was unconstitutional as applied to him. (ECF No. 96-4 at 7.) Plaintiff's as-applied challenge is premised on the contention that Defendants selectively enforced the ordinance against him because of his conservative political views. (*Id.*) "[C]lassifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated ....[a] facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Antonyuk v. James*, 120 F.4th 941, 982–83 (2d Cir. 2024) (internal citations and quotation marks omitted). "[A]n as-applied challenge ... requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." *Higbie v. James*, 795 F. Supp. 3d 307, 335 (N.D.N.Y. 2025) (internal citations and quotation marks omitted).

The Court has already found that the statute was unconstitutional on its face, as it cannot be "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non– Violence*, 468 U.S. 288, 293 (1984)). The Sign Law purports to restrict political signs, making it impermissibly content based. As such, Plaintiff was cited because he engaged in political speech.

Plaintiff's as-applied theory, however, goes a step further. Plaintiff contends that Defendants did not merely enforce an unconstitutional ordinance against him, but selectively enforced the ordinance against him because of his conservative political views. (ECF No. 96-4 at 7.) "'Viewpoint discrimination is a subset or particular instance of the more general phenomenon of content discrimination, in which the government targets not subject matter but particular views taken by speakers on a subject.'" *Dolce v. Connetquot Cent. Sch. Dist.*, No. 24-CV-00622 (HG), 2025 WL 1070079, at *9 (E.D.N.Y. Apr. 9, 2025) (quoting *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 31 (2d Cir. 2018)). "In general, government viewpoint discrimination against private speech violates the First Amendment unless it is narrowly tailored to achieve a compelling government interest." *Wandering Dago*, 879 F.3d at 39.

"To state an as-applied viewpoint discrimination claim" under the First Amendment, Plaintiff must show that he was "'prevented from speaking while someone espousing another viewpoint was permitted to do so.'" *Lang v. Town of Tusten, NY*, No. 14 CV 4136 VB, 2015 WL 5460110, at *8 (S.D.N.Y. Aug. 6, 2015) (quoting *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014)). Indeed, the Second Circuit has observed that "there can be overlap between a 'viewpoint discrimination' claim under the First Amendment and a 'selective enforcement' claim under the Equal Protection Clause of the Fourteenth Amendment[.]" *Berg v. Vill. of Scarsdale*, No. 20-4130-CV, 2021 WL 5751385, at *3 (2d Cir. Dec. 3, 2021) (summary order). Just as

"knowledge is ordinarily required to establish" a selective enforcement claim under the Fourteenth Amendment, *LaTrieste Rest. v. Vill. of Port Chester*, 188 F.3d 65, 70 (2d Cir. 1999), so too in the First Amendment context, a plaintiff cannot show "a pattern of unlawful favoritism" unless there is some "evidence that there were complaints about [other infractions] that were brought to the attention of the police, and that any such complaints were ignored." *Berg*, 2021 WL 5751385, at *3.[9]

In *Berg*, the plaintiff brought an as-applied First Amendment claim, alleging that police were "selectively enforcing" the village sign law against political signs while "turning a blind eye" to commercial signs. *Id.* The Second Circuit found the government entitled to summary judgment, because "there [wa]s no evidence" that "police were intentionally targeting political signs"; "[r]ather, . . . the police responded when complaints were made about signs illegally placed in the right-of-way, whether commercial or political." *Id.*

Similarly, in *Church of Am. Knights of the Ku Klux Klan v. Kerik*, the plaintiffs alleged viewpoint discrimination in violation of the First Amendment where police enforced New York's anti-mask law against them but not against others. 356 F.3d 197 (2d Cir. 2004). The district court agreed in light of "other high-profile, non-entertainment gatherings in which the police department did not arrest participants who covered their faces," and therefore granted summary judgment in favor of the plaintiffs. *Id.* at 202. The Second Circuit reversed, because it concluded that the comparators were not "similarly situated." *Id.* at 210. The difference was that the plaintiffs had applied for a permit "and specifically informed the police that they would

[9] For an illuminating discussion of the overlap between Equal Protection and as-applied First Amendment claims, see *Hoye v. City of Oakland*, 653 F.3d 835, 854–55 (9th Cir. 2011). "While courts must undoubtedly make doctrinal space for challenges to the content-discriminatory enforcement of content-neutral rules, it is not clear into which precise category of constitutional claims such challenges fit." *Id.* at 854.

be wearing masks in violation of" New York law; not surprisingly, the police refused to grant them a permit. *Id.* at 211. The comparators, by contrast, "did not provide advance warning of their intent to wear masks." *Id.* at 211. Because the plaintiffs could not point to "any other group [that] was granted a permit" in circumstances analogous to theirs, the Second Circuit concluded that they "failed to establish a case of either viewpoint discrimination or selective enforcement." *Id.*

By expressly applying selective-enforcement principles to a viewpoint-discrimination case, *Church of American Knights* confirms *Berg*'s holding that an as-applied First Amendment challenge requires a plaintiff to show actual knowledge. It is not enough that others broke the law and got away with it. The plaintiff must show that the police *knew about* that violation and consciously chose to turn a blind eye.

Here, the evidence demonstrates that whenever Defendants learned of a violation, they acted on it. Officer Vais was shown at his deposition photos of various flags in Long Beach. When asked whether they violated the Sign Law, he responded that he did not know, because he assumed they were on private property, or were put up by the City itself, or were put up with a permit. (ECF No. 94-3 at 23:17–25:4, 26:9–28:23, 30:18–16.) With respect to one—a flag near a gas station on the outer side of the sidewalk—he was forced to concede it was a violation, since the outer side of the sidewalk is public property. (*Id.* at 28:24–30:17.) But even there, the fact that he never issued a summons before does not indicate discriminatory animus toward Plaintiff; it simply shows that Vais had never noticed the gas-station flag as a potential violation until it was pointed out to him at his deposition.

Commissioner Walsh likewise testified that he assumed many of the comparators were either owned by the City or had received permits. (Walsh Dep. at 18:11–22:2.) With respect to

American flags in particular, Walsh had an even more fundamental reason for not pursuing violations: he believed them to be excluded from the definition of "flags" under the Sign Law. (*Id.* at 22:3–23:6.) This seems to be based on his interpretation of Section 2-2 of the Code, "Definitions," which, as discussed above, is distinct from Section 3-3, "Exemptions." Whether Walsh's interpretation is right or wrong is not germane for present purposes; what matters is that police were not subjectively *aware* of violations and therefore Plaintiff cannot show selective enforcement.

The flags that did garner the attention of the LBPD were those about which the LBPD received complaints. (*See* Pl.'s 56.1 Stmt. ¶¶ 10–11; Kalnitsky Aff. ¶¶ 2–3; Vais Dep. at 16:5–14; Walsh Dep. at 37:1-38:23.) Plaintiff's political flags were the subject of complaints from Long Beach citizens. (Pl.'s 56.1 Stmt. ¶¶ 10–11; Kalnitsky Aff. ¶¶ 2–3; Vais Dep. at 16:5–14.) And the Riptides owner's Pride flag was brought to the attention of the LBPD through complaints by Plaintiff. (Walsh Dep. at 37:1-38:23.)

As such, the record demonstrates that Defendants' recognition of a violation was consistent when the violation was specifically brought to their attention.[10] Plaintiff has not produced evidence from which a reasonable factfinder could conclude that Defendants enforced the ordinance against him because of hostility toward his conservative viewpoint. Accordingly, although the Court grants Plaintiff's motion for summary judgment vis-à-vis the facial prong of Count IV, the Court grants Defendant's motion vis-à-vis the as-applied prong.

[10] In their brief, Defendants assert that "[c]ontrary to Plaintiff's claims, Subsection 3-7(d) contains no exemptions." (ECF No. 95 at 16.) This seems in line with Vais's position but contrary to Walsh's. The discrepancy between Vais's and Walsh's interpretations has no bearing on the question of selective enforcement—either way, Defendants had reasons to believe the other flags were not violations. It does, however, have bearing on the facial challenge. *See supra* § III.B (explaining that the Sign Law is still unconstitutional on its face, even after the amendment to Section 3-3, because the carveout in Section 3-2 remains).

**IV. Monell Liability**

Having found that Section 3-7(d) of the Sign Law was facially unconstitutional and that Plaintiff is entitled to monetary damages, it follows that the City of Long Beach is liable under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). "[U]nder *Monell*, municipalities and other local governmental entities may be held liable under 42 U.S.C. § 1983 for constitutional violations caused by an official policy or custom." *Milau v. Suffolk Cnty.*, No. 17-CV-06061 (JS) (SIL), 2025 WL 1029394, at *11 (E.D.N.Y. Feb. 13, 2025). "To hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Lucente v. County of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)). A policy or custom may be established in in one of four ways:

> [B]y alleging the existence of (1) a formal policy; (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policymakers; or (4) a failure to properly train or supervise municipal employees that amounts to deliberate indifference to the rights of those whom municipal employees will come into contact.

*Mineo v. Town of Hempstead*, No. 22CV04092JMAJMW, 2024 WL 1077874 (E.D.N.Y. Feb. 23, 2024) (internal citation omitted), *report and recommendation adopted*, No. 22-CV-04092 (JMA) (JMW), 2024 WL 1072569 (E.D.N.Y. Mar. 12, 2024).

Defendants argue that the City cannot be held liable under *Monell* because Plaintiff has not demonstrated a widespread pattern or practice. (ECF No. 95 at 11–12.) But there is no need to demonstrate widespread practice, because the Sign Law itself—a formal policy—is unconstitutional. *Withers*, 2010 WL 11712641, at *5 (holding municipality liable under *Monell*

after determining that the sign ordinance was unconstitutional); *see also, e.g.*, *Milau*, 2025 WL 1029394, at *11 (holding county liable under *Monell* based on a "formal written policy").

**V. Qualified Immunity**

Finally, Defendants argue that the Individual Defendants—Gayden, Walsh, and Vais—are entitled to qualified immunity. (ECF No. 95 at 18–19.) "The qualified immunity doctrine protects federal and state officials from suit for acts undertaken in their official capacity if '(1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights.'" *White v. Gutwein*, No. 20-CV-4532 (NSR), 2022 WL 2987554, at *11 (S.D.N.Y. July 28, 2022) (quoting *Wyant v. Okst*, 101 F.3d 845, 857 (2d Cir. 1996)). Here, there is no dispute that the right in question—the First Amendment—was clearly established. Rather, Defendants' argument seems to be predicated on the second prong, namely, that it was objectively reasonable for the Individual Defendants to believe their acts did not violate that right.

The Court agrees. If the Sign Law had categorically prohibited all signs on public property, it would have been constitutional. And that was how Vais interpreted it. (*See* Vais Dep. at 15:14–16:4 (Vais testifying that Section 3-7(d) has no exemptions).) Although the Court disagrees with that interpretation, it was not unreasonable.

Walsh is a closer call. Because he interpreted the Sign Law to exempt flags of nations (*see* Walsh Dep. at 13:13–15:21), one might argue that he should have realized it was unconstitutional. However, the Second Circuit has made clear that "notwithstanding potential or even foreseeable constitutional challenge, '[u]ntil judges say otherwise, state officers ... have the power to carry forward the directives of the state legislature,' and that 'absent contrary direction, state officials and those with whom they deal are entitled to rely on a presumptively valid state statute, enacted in good faith and by no means plainly unlawful.'" *Connecticut ex rel.*

*Blumenthal v. Crotty*, 346 F.3d 84, 102 (2d Cir. 2003) (quoting *Lemon v. Kurtzman*, 411 U.S. 192, 208–09 (1973)). Furthermore, "'[t]he enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws.'" *Id.* at 103 (quoting *Michigan v. DeFillippo,* 443 U.S. 31, 38 (1979)). As such, "enforcement of a presumptively valid statute creates a heavy presumption in favor of qualified immunity[,]" unless the statute was "so *obviously* unconstitutional at the time of enforcement as to support a conclusion that its enforcement was unreasonable." *Id.* at 104–05 (emphasis in original).

Here, at the time of the ordinance's enforcement, Walsh had the duty to enforce the law as presumptively valid. *See id.*; (Walsh Dep. 24:3–7 (testifying that "as part of my position, I have no reason to believe that [the ordinance] was unconstitutional or anything problematic with the way it was written. I have no idea about that").) The record also demonstrates that Walsh made a good faith effort to ensure that the law was constitutional in its application to Plaintiff. (Walsh Dep. 42:6–9 (stating that in his discussions with government officials, "[w]e discussed the flags, we discussed the complaints, I remember making her aware that this is constitutionally protected speech, we have to be careful. [Ms. Gayden] said well, we need to enforce the city ordinance where appropriate, and I said that's what we would do").)

Accordingly, it was not unreasonable of the Individual Defendants to enforce, in the course of their ordinary duties, an ordinance they mistakenly interpreted as constitutional. *Knoeffler v. Town of Mamakating*, 87 F. Supp. 2d 322, 329 (S.D.N.Y. 2000) (finding sign ordinance unconstitutional but nevertheless finding enforcement agent entitled to qualified

immunity because he did not act "objectively unreasonably"); *Withers*, 2010 WL 11712641, at *6 (same).

The Individual Defendants are therefore entitled to qualified immunity and are not personally liable.

## CONCLUSION

For the reasons stated above, the Court grants Defendants' motion for summary judgment (ECF No. 94) as to Counts I, II, and III of the FAC, and dismisses those claims. As to Count IV, the Court grants in part and denies in part both Defendants' motion (ECF No. 94) and Plaintiff's motion (ECF No. 96). Specifically, the Court finds that Section 3-7(d) of the Sign Law was—and still is—unconstitutional, so Plaintiff is entitled to summary judgment on the facial prong of Count IV; but Defendants did not selectively enforce the Sign Law against Plaintiff, so Defendants are entitled to summary judgment on the as-applied prong of Count IV. Finally, the Court finds that the City is liable to Plaintiff under *Monell*, but the Individual Defendants are entitled to qualified immunity.

A jury trial on damages is scheduled for **February 16, 2027, at 9:30 AM,** in courtroom 1020 of the Central Islip courthouse. The parties shall appear for a pretrial conference on **December 16, 2026, at 12:00 PM**, and shall file a joint pretrial order in accordance with this Court's Individual Practice Rules on or before **December 8, 2026**.

Dated: Central Islip, New York
November 12, 2026

**S O O R D E R E D:**

/S/ *James M. Wicks*
JAMES M. WICKS
United States Magistrate Judge